THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| RADIAN ASSET ASSURANCE INC., | ) |
| | ) |
|      Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MADISON COUNTY, MISSISSIPPI, acting by and through its duly elected Board of Supervisors, | ) |
| | ) |
|      Defendant, | ) |
| | ) |
| and | ) |
| | )   Case No.  3:13-cv-686-CWR-LRA |
| PARKWAY EAST PUBLIC IMPROVEMENT DISTRICT, acting by and through its Board of Directors, | ) |
| | ) |
|      Defendant/Counter-Plaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| ST. DOMINIC HEALTH SERVICES, INC., BARNETT PLACE PROPERTIES, LLC, CURTIS WHITTINGTON, JANET WHITTINGTON, JOHN FORD, and TAMARA FORD, | ) |
| | ) |
|      Intervening Defendants/Counter-Plaintiffs. | ) |

**MEMORANDUM IN SUPPORT OF RADIAN ASSET ASSURANCE INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff, Radian Asset Assurance Inc., pursuant to Federal Rule of Civil Procedure 56, respectfully submits this Memorandum of Law in Support of its Motion for Partial Summary Judgment, and states as follows:

1

## INTRODUCTION AND PROCEDURAL BACKGROUND

This dispute arises out of the creation of the Parkway East Public Improvement District ("Parkway East" or the "District") and the District's issuance of special assessment bonds to finance the acquisition, construction, maintenance, and operation of capital infrastructure improvements within the 1,050 acres of land that comprise the District.  The Plaintiff, Radian Asset Assurance Inc. ("Radian"), is the bond insurer and initiated this lawsuit by filing its Complaint for Declaratory Judgment against the County and the District on November 1, 2013.[1] Defendant Madison County, Mississippi (the "County"), through its duly-elected Board of Supervisors, created the District, and entered into a Contribution Agreement with the District (more specifically defined below) that is at the heart of this lawsuit.

The District was created in 2002 and the sale of the original bond issue occurred in 2005. This case thus has a 10-plus-year history involving numerous individuals and an extensive factual landscape.   In the interests of judicial economy, the parties agreed—with the Court's approval—to engage in an initial discovery phase limited to specific issues followed by expedited motion practice related to same.  As set forth in the Case Management Order, those specific issues are as follows:

(1)     The affirmative defenses of ripeness and standing raised by the County and the District in their respective Answers;

(2)     The legal interpretation of the Contribution Agreement as to whether the District's failure to reimburse the County within the two-year anniversary date of a contribution payment by the County suspends or terminates the County's obligations under the Contribution Agreement, and whether the

---

[1] Several Defendants—St. Dominic Health Services, Inc., Barnett Place Properties, LLC, Curtis and Janet Whittington, and John and Tamara Ford (collectively the "Intervenors")—intervened in the lawsuit and filed a Counterclaim for declaratory judgment against Radian.  (*See* Docs. 22, 33, and 41.)  The issues related to the request for declaratory relief raised in Radian's Complaint to which the Intervenors seek the opposite conclusion in their Counterclaim—relating to the District's authority to alter the methodology used to calculate the Aggregate Annual Special Assessments assessed against the District Landowners—are not within the scope of the initial discovery phase permitted by the Case Management Order.  Resolution of those issues must await adjudication in further proceedings.

2

two-year reimbursement period in the Contribution Agreement may be extended by operation of law; and

(3)     Arguments related to the respective covenants, agreements, and obligations of the parties under the Contribution Agreement.

(*See* Case Management Order ¶ 5(b) and (c).)

After engaging in approximately eight months of discovery (including written discovery and depositions), Radian filed its First Amended Complaint on October 20, 2014. (Doc. 159.) The County and the District filed their respective Answers on November 3, 2014.[2]  (Docs. 162 & 163.)  As reflected in those pleadings, although there is a dispute as to the ultimate disposition of this lawsuit, there are many facts that are indeed not in dispute.  And, more specifically, many of those undisputed facts relate to the specific issues set forth in the Case Management Order.  Based on those undisputed facts, Radian seeks a judgment as a matter of law that:

(1)     The County owes the District and all others benefitting from the Contribution Agreement a duty of good faith and fair dealing with respect to the County's performance under the Contribution Agreement;

(2)     The Contribution Agreement does not contain a "time is of the essence" provision; and

(3)     Parkway East's failure to reimburse the County within the two-year reimbursement period set forth in the Contribution Agreement does not terminate the parties' respective obligations thereunder.

Radian's entitlement to the other relief for which it has prayed in its First Amended Complaint must await adjudication in further proceedings.

---

[2] The District also filed a Counterclaim for Declaratory Judgment against Radian.  (*See* Doc. 163 (located at pp. 38-44) & 163-1.)  Like the Intervenors' Counterclaim, however, the District's Counterclaim relates to issues that are not within the scope of the initial discovery phase permitted by the Case Management Order and resolution of those issues must therefore await adjudication in further proceedings.

3

## UNDISPUTED FACTS

On November 22, 2002, the County created Parkway East, a Mississippi special-purpose government entity authorized under Mississippi Code Annotated § 19-31-1, *et seq*. (Statement of Undisputed Material Facts in Support of Radian's Motion for Partial Summary Judgment ("SUMF" and filed contemporaneously herewith), ¶ 1.) Parkway East was created for the purpose of, *inter alia*, financing and managing the acquisition, construction, maintenance, and operation of capital infrastructure improvements within the 1,050 acres of land that comprise the District ("Construction Project"). (SUMF ¶ 3.) The Construction Project included the construction of a four-lane, median-divided parkway lying within the District (the "Parkway East Road"). (SUMF ¶ 4.)

The District financed the Construction Project through the sale of special assessment bonds issued pursuant to that certain Trust Indenture dated July 1, 2005 ("Original Indenture"), by and between the District and Hancock Bank, a banking corporation organized under the laws of the State of Mississippi ("Trustee"). (SUMF ¶ 5.) Pursuant to the Original Indenture, the District issued special assessment bonds in the aggregate principal amount of Twenty Seven Million Seven Hundred Seventy Thousand and 00/100 Dollars ($27,770,000.00) (the "2005 Bonds").[3] (SUMF ¶ 6.) In addition to financing the Construction Project, the proceeds derived from the issuance of the 2005 Bonds in the amount in the amount of $1,948,350.00 were used to create a debt service reserve fund for the 2005 Bonds ("Debt Service Reserve Fund"). (SUMF ¶ 7.)

The annual Debt Service requirement for the 2005 Bonds is approximately $1,950,000.00, payable to the 2005 Bondholders in two installments: the first due on May 1 of

---

[3] The payment of the regularly scheduled principal of and interest on the 2005 Bonds is guaranteed by Radian pursuant to that certain Financial Guaranty Insurance Policy Number FMLI-0101-05208-MS issued by Radian on July 27, 2005 (the "Policy"). (SUMF ¶ 20.)

each year, comprised of principal maturing during such period and accrued interest ("Principal Payment"), and the second due on November 1 of each year, comprised solely of further accrued interest ("Interest Payment").[4]  (SUMF ¶ 8.)  The 2005 Bonds are secured by the District's pledge of revenues that are derived from special assessments to be levied and collected by the District pursuant to its powers as a special-purpose government entity under Mississippi Code Ann. § 19-31-1, *et seq.* ("Special Assessments"), from revenue derived from foreclosure proceedings for the enforcement of the collection of the Special Assessments, and other sources. (SUMF ¶ 9.)  The District therefore has the authority and is required to assess and levy Special Assessments against individuals and entities owning lands within the District ("District Landowners") in order to pay for the Debt Service on the 2005 Bonds. (SUMF ¶ 10.)

The County and the District entered into a contribution agreement dated July 27, 2005 ("Contribution Agreement").[5]  (SUMF ¶ 11.)  The Contribution Agreement provides, in relevant part, as follows:

- "[P]ursuant to Section 19-31-17(o) of the Act [defined in the Contribution Agreement as the Public Improvement District Act codified at Sections 19-31-1 *et seq.* of the Mississippi Code], the County and Parkway East desire to enter into this Agreement in order to memorialize their mutual understanding with respect to the joint participation of the County and Parkway East in the financing of public infrastructure improvements and facilities to be located within the County and Parkway East and necessary to serve the needs of the people of the County and Parkway East";

- "Provided that the covenants, agreements, and obligations of Parkway East as stated herein are performed and/or provided to the County's satisfaction, the County hereby agrees that in the event Parkway East fails, for any reason, to levy and/or collect (or have collected) a sufficient amount of Special Assessments from the owners of land within Parkway East in order to satisfy any Debt Service Payment, the County shall advance to the paying agent,

---

[4] The Principal Payments and Interest Payments are each referred to herein from time to time as a "Debt Service Payment."

[5] The Contribution Agreement was prepared by attorneys at the law firm of Butler, Snow, O'Mara, Stevens and Cannada, PLC (n/k/a Butler Snow, LLP).  (SUMF ¶ 12.)

and/or the Bond trustee, the outstanding amount required to satisfy the deficient Debt Service Payment";[6]

- "Parkway East hereby covenants and agrees to provide full reimbursement to the County, not later than two (2) years from the date the deficient Debt Service Payment is made, for the amounts the County provides to the paying agent, and/or the Bond trustee, pursuant to this Section 3, regardless of the source of the Parkway East funds to pay such reimbursement;" and

- "The parties also agree that, in the event of a sale of a parcel of land for taxes (pursuant to Section *19-31-33* of the Act) upon which a Special Assessment was levied but not collected, the County shall be immediately reimbursed for the County's advance to such deficiency with the proceeds of such tax sale;" and

- According to its own terms, the term of the Contribution Agreement "shall be for the duration of any Bonds issued by [the District]."

(SUMF ¶¶ 13-17.)   Importantly, the Contribution Agreement does not contain a termination provision nor does it, on its face, state that "time is of the essence."   (SUMF ¶¶ 18-19.)

Pursuant to the Original Indenture, the District was not scheduled to begin the repayment of principal of the 2005 Bonds until the calendar year 2008; Interest Payments, however, became due and payable beginning May 1, 2006.  (SUMF ¶ 23.)  Because the District did not anticipate levying Special Assessments until after the completion of the Construction Project—originally anticipated to be completed within two (2) years of the issuance of the 2005 Bonds—bond proceeds in the amount of $2,357,991.92 were deposited into a designated account at closing to satisfy Interest Payments owed to the Bondholders in the calendar years 2006 and 2007 (hereinafter "Capitalized Interest Fund").  (SUMF ¶¶ 24-25.)   Proceeds from the Capitalized Interest Fund were thus used to satisfy the Debt Service Payments due and payable to the 2005 Bondholders on May 1, 2006, November 1, 2006, and May 1, 2007.  (SUMF ¶ 26.)

---

[6] Payments the County is obligated to make under this provision of the Contribution Agreement are hereinafter referred to as either a "County Contribution" or a "Contribution Payment."

6

In or around late 2006/early 2007, the County announced plans to develop and construct an Interstate 55 overpass interchange at the intersection of Parkway East Road and Reunion Parkway located in Madison County ("I-55 Interchange").  (SUMF ¶ 27.)  Because the plans for the I-55 Interchange did not materialize until after construction began on the Parkway East Road, it was necessary to relocate portions of the Parkway East Road that had already been completed.[7] (SUMF ¶ 28.)  The relocation of the Parkway East Road to accommodate the construction of the I-55 Interchange delayed the original anticipated completion date of the Parkway East Road. (SUMF ¶ 30.)  Indeed, instead of completing the construction of the Parkway East Road within two years from the start of construction, the District did not complete the Parkway East Road until early 2009.  (*Id.*)  And, as a direct result of the delay of the completion of Parkway East Road, the District did not begin to levy Special Assessments against District Landowners until after the first Principal Payment became due and payable to the Bondholders on May 1, 2008 (the "May 2008 Principal Payment").  (SUMF ¶ 31.)

Because the District did not levy Special Assessments against District Landowners until 2008 (payable in early 2009), the District lacked sufficient funds from the collection of Special Assessments to make the May 2008 Principal Payment.  The District's solution to the lack of Special Assessments available to make the Principal and Interest Payments due and payable to the 2005 Bondholders in the calendar year 2008 was to generate additional funds through the issuance of "Completion Bonds."[8]  On May 1, 2008, the District issued Completion Bonds pursuant to that certain Supplemental Trust Indenture dated May 1, 2008 ("Supplemental

---

[7] The relocation of the Parkway East Road at the I-55 Interchange, and the County's agreement to reimburse Parkway East for construction costs related thereto, are the subject of the Memorandum of Understanding entered into by and between the County and the District.  (SUMF ¶ 27.)

[8] The Original Indenture authorizes the District to issue supplemental bonds under two circumstances: to raise funds for (i) the refunding of the 2005 Bonds ("Refunding Bonds") or (ii) the completion of the Construction Project ("Completion Bonds").  (SUMF ¶ 32.)

Indenture"), by and between the District and the Trustee in the aggregate principal amount of Three Million and 00/100 Dollars ($3,000,000.00) ("2008 Bonds").  (SUMF ¶¶ 33-34.)  The District intended from the outset that a portion of the proceeds of the 2008 Bonds—approximately $1.8 million—would be used to satisfy Debt Service requirements.  (SUMF ¶ 35.)  Importantly, the County did not object to the delay in the District's levy of Special Assessments and the County was aware of the District's intention to issue Completion Bonds.  (SUMF ¶ 36.)

The District first levied Special Assessments against District Landowners in the calendar year 2008 which were payable in early 2009.  (SUMF ¶ 38.)  From the time the District first began to levy Special Assessments, however, it experienced significant difficulties collecting a sufficient amount to satisfy the Debt Service requirements.  (SUMF ¶ 39.)  Indeed, as early as March 5, 2009, the District anticipated that it would not have sufficient Special Assessments collected to satisfy the Debt Service Payment due and payable to the 2005 Bondholders on May 1, 2009 (the "May 2009 Principal Payment").  (SUMF ¶ 40.)  The District, after consultation with the Trustee, initially contemplated either the use of monies in the Debt Service Reserve Fund or proceeds from the sale of the 2005 Bonds held by the Trustee to pay Debt Service or seeking a Contribution Payment from the County to cover the shortfall in the May 2009 Principal Payment.  (SUMF ¶ 41.)  Upon learning of the District's intention to either use monies in the Debt Service Reserve Fund or call upon the County to make a Contribution Payment, however, the County "expressly directed" the District to "not utilize any funds from the Debt Service Reserve Fund . . ." and further "direct[ed] that any and all funds held by or available to the [District] be exhausted prior to any contribution by Madison County taxpayers" pursuant to the Contribution Agreement.  (SUMF ¶ 42.)  The reasons given for the County's directives included, *inter alia*, that such alternatives would "trigger[] a disclosure requirement under the Trust

Indenture, including disclosure of the draw to various bond rating agencies," and, as a result, the County's general obligation bond rating would be "negative[ly] impact[ed]." (SUMF ¶ 43.)

By the time the May 2009 Principal Payment was due and payable, the District had not collected a sufficient amount of Special Assessments to cover the entire amount owed to the 2005 Bondholders.[9] (SUMF ¶ 44.) When the time came to choose the source of funds to make the May 2009 Principal Payment, the District acknowledged that the County "d[id] not want to consider the terms and conditions of the Contribution Agreement" or "the use of the Bond Debt Reserve Fund." (SUMF ¶ 45.) The District therefore acquiesced to the County's directives and authorized the use of bond proceeds allocated for construction to cover the shortfall with respect to the May 2009 Principal Payment.[10] (SUMF ¶ 46.)

As the time approached to make the Debt Service Payment due and payable to the 2005 Bondholders on November 1, 2009 ("November 2009 Interest Payment"), however, the Special Assessments associated with two of the largest tracts of land within the District—owned by Landspan, LLC and Landstock, LLC, respectively—had not been paid. (SUMF ¶ 48.) The District anticipated that the properties owned by Landspan, LLC and Landstock, LLC (hereinafter, respectively, the "Landspan Property" and the "Landstock Property") would sell at the tax sale held in August 2009 and generate sufficient revenue to, at a minimum, satisfy the November 2009 Interest Payment. (SUMF ¶ 49.) Neither the Landspan nor the Landstock Properties sold at the August 2009 tax sale. (SUMF ¶ 50.) The District therefore lacked a

---

[9] The Special Assessments for the calendar year 2008 were due to be paid not later than February 1, 2009 (the "2008 Special Assessments"). (SUMF ¶ 47.)

[10] The Original Indenture, the Supplemental Indenture, and the Contribution Agreement require that the requisition of bond proceeds of the 2005 and 2008 Bonds be approved by the District and the County through the execution of the requisition form attached to the Original Indenture as Exhibit C. (SUMF ¶ 35.)

sufficient amount of Special Assessments to cover the entire amount owed to the 2005 Bondholders on November 1, 2009.  (SUMF ¶ 51.)

The District initially contemplated five (5) alternatives to satisfy the November 2009 Interest Payment: (1) call on the County to make a Contribution Payment, (2) use construction funds that had been set aside to complete certain water and sewer portions of the Construction Project, (3) access monies in the Debt Service Reserve Fund, (4) obtain a loan, or (5) raise Special Assessments.  (SUMF ¶ 52.)  On October 8, 2009, the District declared that it would not use Construction Funds to make the November 2009 Interest Payment and instead authorized its attorney to formally request that the County comply with its obligations under the Contribution Agreement or, alternatively, use funds in the Debt Service Reserve Fund.  (SUMF ¶ 53.)  In that vein, on October 19, 2009, the District's attorney appeared before the Madison County Board of Supervisors and formally requested that the County make a payment under the Contribution Agreement sufficient to cover the November 2009 Interest Payment shortfall.   (SUMF ¶ 54.)

The County, however, through its Board of Supervisors, rejected the District's request finding that it was not under any obligation under the Contribution Agreement to cover the Debt Service shortfall.  (SUMF ¶ 55.)  Not only did the County reject the District's request, it also, through its duly authorized Chancery Clerk and Clerk of the Board, called the District's request that the County comply with the Contribution Agreement "inappropriate and irresponsible." (SUMF ¶ 56.)  The County further directed the District to not use monies in the Debt Service Reserve Fund to cover any shortfall with respect to the November 2009 Interest Payment.[11]

---

[11] The County was concerned that the District's use of monies in the Debt Service Reserve Fund would have a "dangerous effect . . . on the county and its credit and bond rating," and labeled the use of monies in the Debt Service Reserve Fund as "equally inappropriate and potentially devastating to the County."  (SUMF ¶ 59.)  At the same time, The County admitted that as a result of its creation of the District, the related bond issuance, and the entry of the Contribution Agreement with the District, it has been subject to political pressure—both from the District itself and from third parties (namely, those other than the County and the District).  (SUMF ¶ 60.)

(SUMF ¶ 58.) Although the District disagreed with the County's interpretation of the Contribution Agreement,[12] the District again acquiesced to the County's directives and authorized the use of bond proceeds allocated for construction to cover the shortfall with respect to the November 2009 Interest Payment.  (SUMF ¶¶ 57, 61.)

The shortfall with respect to the November 2009 Interest Payment was not an isolated incident; to the contrary, the District continued to experience shortfalls with respect to the Debt Service Payments owed to the 2005 Bondholders.  Indeed, the District lacked sufficient Special Assessment collections to pay the Debt Service Payments due and payable to the 2005 Bondholders on May 1, 2010 and May 1, 2011  (the "May 2010 Principal Payment" and "May 2011 Principal Payment," respectively)  in full.[13]  (SUMF ¶¶ 62, 65.)  To make up those shortfalls, the District used a combination of (i) excess Debt Service Reserve Fund monies and (ii) funds from an account the District held at BankFirst, and (iii) bond proceeds.  (SUMF ¶¶ 63, 66.)

In sum, from November 2007 to April 2011, the County and the District approved  and/or ratified—as required by the Original Indenture—the use of approximately $2,600,000 of proceeds from the 2005 and 2008 Bonds to pay the Debt Service on the 2005 and 2008 Bonds.  (SUMF ¶ 67.)  The use of bond proceeds held by the Trustee for construction to pay debt service is significant because, although the Parkway East Road was completed, the Construction Project as a whole—as that term is defined in the Original Indenture and described in the Engineer's

---

[12] Noting specifically that the County "overlooked the fact that [the District was] not requesting an unexplained loan from the Board of Supervisors, but [instead was] very simply asking it to comply with the Contribution Agreement which is clear as to its responsibility toward Parkway East."  (SUMF ¶ 57.)

[13] The District had sufficient Special Assessment collections to pay the Debt Service Payment due and payable to the 2005 Bondholders on November 1, 2010 ("November 2010 Interest Payment") in full.  (SUMF ¶ 64.)

Report—was not.  (SUMF ¶ 68.)  In fact, at least $900,000.000 of the Construction Project for certain water and sewer facilities and infrastructure remain to be completed.[14] (SUMF ¶ 69.)

After May 1, 2011, the collection of Special Assessments remained insufficient to pay the Debt Service requirements on the 2005 Bonds.  (SUMF ¶ 70.)  Additionally, by October 2011, there were insufficient Construction Funds to make up the shortfall in the Special Assessments collected from District Landowners to pay the Debt Service Payment due and payable to the 2005 Bondholders on November 1, 2011 (the "November 2011 Interest Payment").  (SUMF ¶ 71.)  As a result, the County was faced with the choice of making a County Contribution or again refusing to make a payment under the Contribution Agreement.

Fortuitously, 219 acres of District property, then owned by Landspan, LLC, Parcel # 082H-28-001/01.00 (the "Landspan Property"), became available in or around the same time as the Construction Funds established under the Original and Supplemental Indenture were depleted.  (SUMF ¶ 72.)  Landspan, LLC had failed to pay Special Assessments on the Landspan Property for the years 2008 and 2009.  (SUMF ¶ 73.)  The property went unsold at tax sales held by the County in August 2009 and 2010 and it was officially "struck off to the state" each time pursuant to Mississippi statute.  (*Id.*)  Pursuant to a statute enacted at that time, the property went to tax sale for a third time in August 2011.  (*Id.*)  After the Landspan property was not sold at the August 2011 tax sale, it was again "struck off to the state" and, because the statutory redemption period had expired, it allowed the Secretary of State to convey the Landspan Property to a governmental entity.  (*Id.*)

On October 14, 2011, the District, pursuant to Mississippi Code Annotated § 29-1-37, submitted an application to the Mississippi Secretary of State requesting that title to the

---

[14] Discovery is ongoing and further discovery may reveal others portions of the Construction Project that have yet to be completed.

Landspan Property be transferred to the District.  (SUMF ¶ 74.)   Shortly after transmission of the District's October 14, 2011 letter, however, the District agreed to withdraw its application for the Landspan Property and instead allow the County to take title to said property.  In accordance with that agreement, the County approved a resolution whereby the County agreed to fund the $374,021.00 November 2011 Interest Payment and directed the Chancery Clerk to submit an application to the Mississippi Secretary of State requesting a tax patent for the Landspan Property.  (SUMF ¶ 75.)  In a letter dated October 24, 2011 to the Secretary of State sent by Arthur Johnston, Madison County Chancery Court Clerk, on behalf of the County Board of Supervisors, Mr. Johnston explained that the County was taking the Landspan Property "in exchange" for being "called upon to make up a certain debt service shortfall incurred by [the] District."[15]  (SUMF ¶ 76.)

On October 24, 2011, the County made its first contribution payment under the Contribution Agreement in the amount of $374,021.00 (the "October 2011 Contribution Payment").  (SUMF ¶ 78.)   Per its agreement with the County, the District withdrew its application for the Landspan Property on October 25, 2011 and requested that the Secretary of State instead transfer title of the Landspan Property to the County.  (SUMF ¶ 79.)  The Secretary State abided by the District's request and, on December 29, 2011, issued a tax land patent to the County for the Landspan Property ("Tax Land Patent").  (SUMF ¶ 80.)

Since accepting the Tax Land Patent, the County has declined to pay the Special Assessments on the Landspan Property citing the exemption from taxation provided for in Mississippi Code Annotated § 27-31-1(b).  (SUMF ¶ 82.)  As a result, Special Assessments that

---

[15] Mr. Johnston's October 24, 2011 letter is consistent with a memorandum he previously prepared in which he was concerned that if the County was called upon to make a payment under the Contribution Agreement, he "want[ed] to insure [sic] that the [C]ounty has and preserves the ability to obtain some asset in exchange, namely, the real property on which the delinquencies are owed."  (SUMF ¶ 77.)

existed on the Landspan Property at the time the County accepted the tax land patent remain unpaid as do the current Special Assessments which constitute a lien on the property as set forth in Mississippi Code Annotated § 19-31-33(3).  (SUMF ¶ 81.)  Specifically, the District has been deprived of 2012 and 2013 Special Assessments (payable in 2013 and 2014) totaling $1,000,000.00 (apprx.), and  the County has likewise not paid the Special Assessments existing when the County took title in December 2011—the 2008, 2009, 2010, and 2011 Special Assessments (payable in 2009, 2010, 2011, and 2012)—of approximately $1,900,000.00. (SUMF ¶¶ 83-84.)

After November 1, 2011—due, in part, to the County's ownership of the Landspan Property—the collection of Special Assessments remained insufficient to pay the Debt Service requirements on the 2005 Bonds.   To cover the deficiency in the Special Assessments for the Debt Service Payments due and payable to the 2005 Bondholders on May 1, 2012, November 1, 2012, and May 1, 2013, the District relied on three additional payments from the County under the Contribution Agreement:

   a.   $464,376.60 on April 25, 2012 (the "May 2012 Contribution Payment");

   b.   $518,401.44 on October 24, 2012 (the "November 2012 Contribution Payment"); and

   c.   $676,514.19 on April 16, 2013 (the "May 2013 Contribution Payment").

(SUMF ¶ 87.)

The next Debt Service Payment owed to the 2005 Bondholders was due and payable on November 1, 2013.  (*See* SUMF ¶ 95.)  On October 18, 2013, the County, through counsel, advised the Trustee, Radian, and other interested parties, that the District's failure to reimburse the County by October 24, 2013, the two-year anniversary date of the County's October 2011

Contribution Payment, would relieve the County of its ongoing obligation to fund under the Contribution Agreement.  (SUMF ¶ 89-90.)  Specifically, the County's position was and is that absent a payment by or on behalf of the District in the amount of $374,021.00—representing the amount of the October 2011 Contribution Payment—plus interest the County "will not be tendering the shortfall amount" due on any Debt Service Payment, and "further that no public funds from Madison County, in any amount, will be contributed towards the debt service on the [2005 Bonds]."  (SUMF ¶ 91.)

The District lacked sufficient funds to make a cash payment to the County in the amount of $374,021.00 prior to November 1, 2013.   (SUMF ¶¶ 95, 100.)  Moreover, the County refused to credit the District's reimbursement obligation under the Contribution Agreement based on the County's receipt of the Landspan Property.[16]  (SUMF ¶ 85.)  As a result, the County did not—at least not according to the County—receive reimbursement by October 24, 2013 and the County refused to cover the shortfall with respect to the November 2013 Interest Payment.  (SUMF ¶¶ 85, 90-91.)   The County has likewise refused to make a payment under the Contribution Agreement to cover the shortfalls associated with the Debt Service Payments due and payable to the 2005 Bondholders on May 1, 2014, or November 1, 2014.  (SUMF ¶ 97.)

Pursuant to the Original Indenture, if there are insufficient funds in the Revenue Fund to satisfy the Debt Service requirements, after taking into account any County Contribution, the Bond Trustee is authorized to pay the Debt Service requirements on the 2005 Bonds out of funds available in the Debt Service Reserve Fund.  (SUMF ¶ 96.)  Since the County's last Contribution Payment on April 16, 2013, the District has yet to collect sufficient funds from Special Assessments to satisfy the Debt Service requirements on the 2005 Bonds.  Specifically,  the

---

[16] The District refused to formally request the Landspan Credit from the County claiming that its Board of Directors "did not feel that they had adequate information on both sides of the story in order to make a firm recommendation in this regard."  (SUMF ¶ 86.)

District did not have sufficient funds from Special Assessment collections to cover the Debt Service Payments due and payable to the 2005 Bondholders on November 1, 2013, May 1, 2014, or November 1, 2014.  (SUMF ¶ 95.)  As a result, the Trustee used funds available in the Debt Service Reserve Fund to make the Debt Service Payments due and payable to the 2005 Bondholders on November 1, 2013 ($501,788.81), May 1, 2014 (856,700.80), and November 1, 2014 ($465,004.46).  (SUMF ¶¶ 98-99.)  The District believes it will not collect sufficient Special Assessments in the future.

Despite the County's failure to make recent Contribution Payments, the County has communicated to the District, Radian, and others that the District's failure to reimburse the October 2011 Contribution Payment, among other County Contributions, did not operate to terminate the Contribution Agreement.  (SUMF ¶ 92.)   Indeed, the County has advised in writing that it "is of the opinion that the Contribution Agreement . . . continues and remains in force as a viable legal document, irrespective of the County's decision to withhold shortfall payments under the same" and that, "so long as any of the 2005 Bonds remaining outstanding," and "absent mutual written consent of the parties," that the Contribution Agreement cannot be terminated.  (SUMF ¶¶ 93-94.)

As of the filing of this summary judgment motion, and notwithstanding the claim for reimbursement based on the County's receipt of the Landspan Property, the District has not reimbursed the County for any Contribution Payment—let alone the October 2011 Contribution Payment.  (SUMF ¶ 100.)

## SUMMARY JUDGMENT STANDARD OF REVIEW

The summary judgment standard of review is set forth succinctly in *Agree v. Broadus*, No. 1:11cv31-HSO-JMR, 2012 U.S. Dist. LEXIS 44636 (S.D. Miss. Feb. 12, 2012) as follows:

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). "The mere existence of a factual dispute does not by itself preclude the granting of summary judgment." *St. Amant v. Benoit*, 806 F.2d 1294, 1296-97 (5th Cir. 1987). "The requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). In other words, "[o]nly disputes over the facts that might [a]ffect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Furthermore, it is well settled in this circuit that "[b]are bones allegations are insufficient to withstand summary judgment because the opposing party must counter factual allegations by the moving party with specific, factual disputes; mere general allegations are not a sufficient response.'" *Howard v. City of Greenwood*, 783 F.2d 1311, 1315 (5th Cir. 1986) (*quoting Nicholas Acoustics Specialty Co. v. H & M Constr. Co.*, 695 F.2d 839, 845 (5th Cir. 1983)).

In considering a motion for summary judgment, the trial court views the evidence in the light most favorable to the party resisting the motion. *See Howard v. City of Greenwood*, 783 F.2d 1311, 1315 (5th Cir. 1986). To survive summary judgment, the non-movant must demonstrate the existence of a disputed issue of material fact. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). To avoid the entry of summary judgment, the non-moving party must bring forth significant probative evidence demonstrating the existence of a triable issue of fact. *See Howard*, 783 F.2d at 1315.

*Id.* at *4-5.

## <u>ARGUMENT</u>

We divide the remainder of this memorandum into three sections. In Section I, we address the County's duty of good faith and fair dealing with respect to the Contribution Agreement. In particular, we ask the Court to find, as a matter of law, that the County owes the District and all others benefitting from the Contribution Agreement a duty of good faith and fair dealing with respect to the County's performance and enforcement thereunder. In Section II, we refute the County's contention that the Contribution Agreement contains a "time is of the essence" provision. Lastly, we explain that the District's failure to reimburse the County within the two-year anniversary date of the County's October 2011 Contribution Payment did not result

in the termination of the Contribution Agreement.  Nor does the District's continued inability to reimburse the County for any of the Contribution Payments necessitate termination of the Contribution Agreement.  As set forth herein, the County agrees with these legal conclusions and thus, we merely ask the Court to confirm that which the parties have already agreed.

## I.   THE COUNTY OWES THE DISTRICT AND ALL OTHERS BENEFITTING FROM THE CONTRIBUTION AGREEMENT A DUTY OF GOOD FAITH AND FAIR DEALING WITH RESPECT TO THE COUNTY'S PERFORMANCE AND ENFORCEMENT UNDER THE CONTRIBUTION AGREEMENT.

It is axiomatic under Mississippi law that "[a]ll contracts carry an inherent covenant of good faith and fair dealing." *See Ferrara v. Walters*, 919 So. 2d 876, 883 (Miss. 2005) (citation omitted); *see also First Alliance Bank v. Miss. Valley Title Ins. Co. (In re Evans)*, No. 09-03763-NPO (Adv. Proc. No. 10-00005-NPO), 2012 Bankr. LEXIS 2887, at *54 (Bankr. S.D. Miss. June 22, 2012) ("In Mississippi, the duty of good faith attaches to both the performance and enforcement of a contract." (citations omitted)).   It is undisputed that the Contribution Agreement is an enforceable contract that is governed by Mississippi law.  (SUMF ¶ 11, 17.) We thus ask the Court to reach the unremarkable conclusion that the County, as a matter of law, owes the District and all others benefitting from the Contribution Agreement a duty of good faith and fair dealing with respect to the County's performance and enforcement thereunder.[17]

---

[17] Radian does not, with this motion, seek to establish as a matter of law that it is either an intended or unintended beneficiary under the Contribution Agreement.  Resolution of that issue must await adjudication in further proceedings.  Regardless of Radian's status as a beneficiary under the Contribution Agreement, there can be no reasonable dispute that the payment of (or the failure to make) County Contributions directly affects Radian's obligations under the Policy.  As a result, it is proper for Radian to move the Court for the requested summary judgment findings herein. *See Md. Cas. Co. v. Nestle*, NO. 1:09cv644-LG-RHW, 2010 U.S. Dist. LEXIS 98053, at *9-11 (S.D. Miss. Sept. 17, 2010) (finding that the defendant/counter-plaintiff had standing to seek a declaratory judgment against the plaintiff/counter-defendant even though the counter-plaintiff was not a party to the contract at issue).

## II.   THE CONTRIBUTION AGREEMENT DOES NOT CONTAIN A "TIME IS OF THE ESSENCE" PROVISION.

In this section, we ask the Court to find as a matter of law that time is not of the essence with respect to the parties' performance under the Contribution Agreement.   Under Mississippi law, "[u]nless a contract expressly states so, or unless there is otherwise shown to be a clear indication of intent, time is not ordinarily considered to be of the essence in the performance of a contract."   *See Ferrara*, 919 So. 2d at 884 (citations omitted).   There is no dispute that the Contribution Agreement does not, on its face, provide that time is of the essence.   (SUMF ¶ 19.) The County nevertheless argues that the Contribution Agreement contains a "time is of the essence" provision.   (*See* First Am. Compl. ¶ 32 ("The Contribution Agreement does not contain a 'time is of the essence' provision.'"); Answer of Madison County ¶ 32 (denying paragraph 32 of Radian's First Amended Complaint).)   contra

The County's purported basis for concluding that the Contribution Agreement contains a "time is of the essence" provision is as follows:

> INTERROGATORY NO. 8:   State in detail the factual basis for denial of Paragraph 29[18] of Radian's Complaint.
>
> RESPONSE: The Contribution Agreement states that "Parkway East hereby covenants and agrees to provide full reimbursement to the County, no later than two (2) years from the date the deficient Debt Service Payment is made, for the amounts the County provides to the paying agent, and/or Bond trustee, pursuant to this Section 3, regardless of the source of the Parkway East funds to pay such reimbursement."   This section of the Contribution Agreement shows a clear indication of intent by the parties to require timely performance by Parkway East.

(Madison County's Response to Interrogatory No. 8 of Radian's First Set of Interrogatories.)[19]

---

[18] Paragraph 29 of Radian's Original Complaint and paragraph 32 of Radian's First Amended Complaint are identical.   (*Compare* Compl. ¶ 29 ("The Contribution Agreement does not contain a 'time is of the essence' provision." (Doc. 1 at 6)), *with* First Am. Compl. ("The Contribution Agreement does not contain a 'time is of the essence' provision." (Doc. 159 at 7).)

Under the County's logic, any contract with a set performance date or that otherwise has defined time parameters would contain a "time is of the essence" provision.  That reasoning is, of course, absurd, as it would render Mississippi law on "time is of the essence" provisions meaningless. *Cf. Fibre Corp. v. GSO Am., Inc.*, No. 5:04cv170-DCB-JCS, 2005 U.S. Dist. LEXIS 37906, at *40 (S.D. Miss. Dec. 8, 2005) ("[U]nless it is expressly stated, strict adherence with a contract's closing date is not normally required." (citing *Ferrara*, 919 So. 2d at 884)).

Moreover, it is undisputed that the Contribution Agreement was prepared by attorneys at the law firm of Butler, Snow, O'Mara, Stevens and Cannada, PLC (n/k/a Butler Snow, LLP) (hereinafter "Butler Snow").  (SUMF ¶12.)  Had either the County or the District considered time to be of the essence with respect to performance under the Contribution Agreement, Butler Snow—a venerable Mississippi-based law firm—would have completed the simple task of inserting the words "time is of the essence" into the agreement.  That, of course, did not happen, a fact which cannot be reasonably disputed.  Accordingly, there is but one reasonable interpretation of the Contribution Agreement: time is not of the essence with respect to the parties' performance thereunder.

In sum, although there may appear to be a dispute as to whether the Contribution Agreement contains a "time is of the essence" provision, that dispute is not genuine.  To the contrary, it is beyond reasonable dispute that the Contribution Agreement does not contain a "time is of the essence" provision and, as a result, time was not considered by the parties to be of the essence in the performance of the parties' respective obligations under the Contribution Agreement.

---

[19] A copy of Madison County's Responses to Radian's Second Set of Request for Admissions, Second Set of Interrogatories, and Second Set of Requests for Production are attached to Radian's Statement of Undisputed Material Facts filed contemporaneously herewith as Exhibit E.

**III.   THE DISTRICT'S FAILURE TO REIMBURSE THE COUNTY WITHIN THE TWO-YEAR ANNIVERSARY DATE OF THE COUNTY'S OCTOBER 2011 CONTRIBUTION PAYMENT—AS WELL AS THE OTHER CONTRIBUTION PAYMENTS—DOES NOT RESULT IN THE TERMINATION OF THE CONTRIBUTION AGREEMENT.**

Mississippi law is well established that "termination of a contract is an 'extreme remedy' and will only be allowed for a material breach."  *See Miss. Power Co. v. Water & Power Techs., Inc.*, 1:03CV763LG-RHW, 2006 U.S. Dist. LEXIS 86385, at *21 (S.D. Miss. Nov. 26, 2006) (citing *Gulf South Capital Corp. v. Brown*, 183 So. 2d 802, 804-05 (Miss. 1966)); *see also Favre Prop. Mgmt., LLC v. Cinque Bambini,* 863 So. 2d 1037, 1044 (Miss. Ct. App. 2004) ("[A] party's ***material*** breach of a bilateral contract excuses further performance by the other party." (emphasis added) (citation omitted)).  That general proposition is consistent with the Mississippi rule that, absent express contractual language to the contrary, a breaching party has the right to cure any breach so long as the breach is non-material.  *See Byrd Bros. v. Herring*, 861 So. 2d 1070, 1073 (Miss. Ct. App. 2003).  Thus, if a breach of contract is non-material, then the non-breaching party is obligated to afford the breaching party a reasonable time to cure the breach.  On the other hand, if the failure to perform qualifies as a material breach, then the non-breaching party may terminate the contract without giving the party in breach the opportunity to cure.

In this case, it is undisputed that the Contribution Agreement contains a provision that obligates the District to reimburse the County within two-years of the County making a Contribution Payment.  The specific language at issue provides as follow:

> Parkway East hereby covenants and agrees to provide full reimbursement to the County, not later than two (2) years from the date the deficient Debt Service Payment is made, for the amounts the County provides to the paying agent, and/or the Bond trustee, pursuant to this Section 3, regardless of the source of the Parkway East funds to pay such reimbursement.

(*See* SUMF ¶ 15.)  It is likewise undisputed that the County made its first Contribution Payment on October 24, 2011 in the amount of $374,021.00.  (SUMF ¶ 78).  Thus, the District had two years—up to and until October 24, 2013—to reimburse the County.  That did not and has not occurred.  Nevertheless, the District's failure to reimburse the County by October 24, 2013 is not a material breach of the contract.  Nor does the District's present inability to repay the County for any of the other Contribution Payments necessitate termination of the Contribution Agreement.   To the contrary, based on the express terms of the Contribution Agreement . the undisputed facts set forth herein, and the County's acknowledgement that the Contribution Agreement remains a viable legal contract, the Court should find as a matter of law that the Contribution Agreement has not been terminated as a result of the District's failure to reimburse the County.

### A.   The District's failure to reimburse the County is not a material breach.

Generally, "[a] breach is material when there 'is a failure to perform a substantial part of the contract or one or more of its essential terms or conditions, or if there is such a breach as substantially defeats its purpose,' or when 'the breach of the contract is such that upon a reasonable construction of the contract, it is shown that the parties considered the breach as vital to the existence of the contract.'"  *See Miss. Power Co.*, 2006 U.S. Dist. LEXIS at *21 (citing *UHS-Qualicare, Inc. v. Gulf Coast Cmty. Hosp., Inc.* 525 So. 2d 746, 756 (Miss. 1987)).  Here, it is undisputed that the timeliness of the District's repayment of County Contribution Payments was not considered vital or material to the contract.

As an initial matter, time was not of the essence with respect to the parties' performance under the Contribution Agreement.  (*See* the discussion *infra* at Section II.)  Mississippi courts have held that the failure to perform within the time allowed by the

contract is not a material breach when the contract does not provide that time is of the essence. *See, e.g.*, *Wright v. Stevens*, 445 So. 2d 791, 794 (Miss. 1984) ("We do not hold that [the defendant builder] was guilty of substantial breach of contract, subjecting him to liability in damages, for failure to complete the contract within sixty (60) days.  The contract did not provide that time was of the essence.  Under such circumstances, the mere fact that there has been a delay in completion will not justify the project owner in terminating a construction contract or rescinding it." (citing *Bevis Constr. Co. v. Kittrell*, 139 So. 2d 375  (Miss. 1962))); *Lee v. Schneider*, 822 So. 2d 311 (Miss. Ct. App. 2002) (finding that because the real estate contract at issue, on its face, did not provide time to be of the essence as far as the scheduled closing date was concerned, the failure to close on the date provided in the contract did not rise to the level of a material breach).  The lack of a time is of the essence provision is thus determinative of materiality in this case, *i.e.*, the District's non-payment within two years was not a material breach of the Contribution Agreement.

There are other undisputed facts that support the conclusion that the District's non-payment within two years was not a material breach.  For example, the following terms (or the absence thereof) in the Contribution Agreement evidence the parties' intent that the District's repayment precisely within two years was not vital to the existence of the contract:

- The lack of a termination provision;

- The lack of any default provisions; and

- The  inclusion of a provision stating the term of the Contribution Agreement was for the "duration of any Bonds issued by the [District]."

(SUMF ¶¶ 17-19.)  When viewed together, the conclusion is inescapable that the timeliness of the District's repayment was not material to the contract as a whole.

The events surrounding the Landspan Property further support the conclusion that the timeliness of the District's repayment was not a vital component of the Contribution Agreement. It is undisputed that after the Landspan Property went unsold at tax sales held by the County, it was "struck off the state" pursuant to Mississippi law.  (SUMF ¶ 73.)  It is likewise undisputed that the District submitted an application requesting that title to the Landspan Property be transferred to the District only to withdraw that application after Arthur Johnston—the then-acting Madison County Chancery Clerk—submitted a letter to the Mississippi Secretary of State explaining that the County was taking the Landspan Property "in exchange" for being "called upon to make up a certain debt service shortfall incurred by [the] District."  (SUMF ¶¶ 74-79.) Based on the County's own words and actions, Radian contends that the District satisfied its reimbursement obligation with respect to the October 2011 Contribution Payment.[20]   At a minimum, however, the County's ownership of the Landspan Property for the past two years— particularly when the Contribution Agreement specifically contemplates that the District would satisfy its reimbursement obligation to the County through the sale of  tax-delinquent property[21]—supports the conclusion that the District and the County did not intend that the timeliness of the District's repayment would be vital or material to the contract.

### B.   The County Does Not Dispute That The District's Failure to Repay the County Does Not Terminate the Contribution Agreement.

Lastly, Radian's entitlement to a finding as a matter of law on this issue is not in dispute. Prior to and throughout this proceeding the County has consistently expressed its agreement with

---

[20] Although the County has since shied away from characterizing the transaction as an "exchange," the letter and memorandum of Mr. Johnston attached to the Statement of Facts filed herewith speak for themselves.  (SUMF ¶¶ 76-77.)

[21] (*See* SUMF ¶ 16 ("The Contribution Agreement provides that "[t]he parties also agree that, in the event of a sale of a parcel of land for taxes (pursuant to Section *19-31-33* of the Act) upon which a Special Assessment was levied but not collected, the County shall be immediately reimbursed for the County's advance to such deficiency with the proceeds of such tax sale.").)

the conclusion that, given the clear mandate of the Contribution Agreement that it is to continue as a viable contract so long as the 2005 Bonds remaining outstanding, the District's past and current inability to repay the County for any of the Contribution Payments likewise does not necessitate termination of the agreement:

- The County has communicated to the District, Radian, and others that the District's failure to reimburse the October 2011 Contribution Payment, among other County Contributions, did not operate to terminate the Contribution Agreement;

- The County has advised in writing that it "is of the opinion that the Contribution Agreement . . . continues and remains in force as a viable legal document, irrespective of the County's decision to withhold shortfall payments under the same; and

- The County has also taken the position that "so long as any of the 2005 Bonds remaining outstanding," and "absent mutual written consent of the parties," that the Contribution Agreement cannot be terminated.

(SUMF ¶¶ 92-94.)  These statements of the County, by themselves, are dispositive of the issue.[22] Notwithstanding that point, they are nonetheless consistent with and support the other relevant undisputed facts set forth above, and further demonstrate that the requested summary judgment finding is warranted.

## <u>CONCLUSION</u>

For the foregoing reasons, and based on the entire record in this matter, Radian respectfully requests that its motion be granted and that it be awarded a judgment as a matter of law that (1) the County owes the District and all others benefitting from the Contribution Agreement a duty of good faith and fair dealing with respect to the County's performance under the Contribution Agreement; (2) time is not of the essence with respect to the County and

---

[22] By agreeing that the Contribution Agreement is not terminated, the necessary implication is that the failure to reimburse with years is not a material breach.  *See Miss. Power Co.*, 2006 U.S. Dist. LEXIS 86385, at *21 (under Mississippi law "termination of a contract is an 'extreme remedy' and will only be allowed for a material breach."  (citing *Gulf South Capital Corp.*, 183 So. 2d at 804-05)).

District's performance and enforcement of the Contribution Agreement; and (3) Parkway East's failure to reimburse the County within the two-year reimbursement period set forth in the Contribution Agreement does not terminate the parties' respective obligations thereunder.

Respectfully Submitted by:

/s/ Jonathan E. Nelson
John C. Speer (admitted *pro hac vice*)
Jonathan E. Nelson (admitted *pro hac vice*)
BASS, BERRY & SIMS PLC
100 Peabody Place, Suite 900
Memphis, Tennessee 38103
Telephone – (901) 543-5900
Facsimile – (901) 543-5999

Alan W. Perry (MS# 4127)
J. Chase Bryan (MS# 9333)
FORMAN, PERRY, WATKINS, KRUTZ & TARDY, LLP
City Centre, Suite 100
200 South Lamar Street
Jackson, Mississippi 39201
Telephone – (601) 960-8600
Facsimile – (601) 960-8613

*Attorneys for Plaintiff Radian Asset Assurance Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 21st day of November, 2014, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's electronic filing system.

| | |
|---|---|
| Robert D. Gholson (MS Bar No. 4811)<br>Ryan J. Mitchell (MS Bar No. 100026)<br>GHOLSON BURSON<br>    ENTREKIN & ORR, P.A.<br>535 N. 5th Avenue (39440)<br>P. O. Box 1289<br>Laurel, Mississippi 39441-1289<br>Telephone: (601) 649-4440<br>Facsimile: (601) 649-4441<br>Email: gholson@gbeolaw.com<br>          mitchell@gbeolaw.com<br><br>*Attorneys for Madison County, Mississippi* | C. R. Montgomery (MS Bar No. 3413)<br>John P. Martin (MS Bar No. 103898)<br>MONTGOMERY MCGRAW, PLLC<br>151 West Peace Street<br>Post Office Box 1039<br>Canton, MS 39046<br>Email: bmontgomery@montgomerymcgraw.com<br>          jmartin@montgomerymcgraw.com<br><br>*Attorneys for Parkway East Public Improvement District* |
| Mike Espy, (Ms. Bar No. 5240)<br>MIKE ESPY, PLLC<br>317 E. Capitol St., Ste. 101<br>Jackson, Mississippi 39201<br>Telephone: (601) 355-9101<br>Facsimile: (601) 355-6021<br>Email: mike@mikespy.com<br><br>*Attorneys for Madison County, Mississippi* | W. Trey Jones (MS Bar No. 99185)<br>Joseph Anthony Sclafani (MS Bar No. 99670)<br>Lane W. Staines (MS Bar No. 102941)<br>BRUNINI, GRANTHAM,<br>    GROWER & HEWES, PLLC<br>The Pinnacle Building, Suite 100<br>Post Office Drawer 119 (39205)<br>Jackson, MS 39201<br>Email: tjones@brunini.com<br>          jsclafani@brunini.com<br>          lstaines@brunini.com<br><br>*Attorneys for St. Dominic Health Services, Inc., Barnett Place Properties, LLC, Curtis Whittington, Janet Whittington, John Ford, and Tamara Ford* |

/s/ Jonathan E. Nelson

13718716.2